IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

NEWPORT PACIFIC CORPORATION,　　)
and MO'S ENTERPRISES, INC.,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　　)　　Case No. 05-995-KI
　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　)　　OPINION AND ORDER
　　　　　　　　　　　　　　　　　)
MOE'S SOUTHWEST GRILL, LLC, and　)
WRAPS OF ARGYLE SQUARE, LLC,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)

　　　　David Casby Rocker
　　　　Sheila Fox Morrison
　　　　Davis Wright Tremaine, LLP
　　　　1300 S.W. Fifth Avenue, Suite 2300
　　　　Portland, Oregon  97201-5630

　　　　　　Attorneys for Plaintiffs

　　　　David J. Stewart
　　　　Holly S. Hawkins
　　　　Alston & Bird, LLP
　　　　1201 West Peachtree Street
　　　　Atlanta, Georgia  30309

Page 1 - OPINION AND ORDER

Kenneth R. Davis, II
Lane Powell P.C.
601 S.W. Second Avenue, Suite 2100
Portland, Oregon  97204-3158

   Attorneys for Defendants

KING, Judge:

Plaintiffs Newport Pacific Corporation ("Newport") and Mo's Enterprises, Inc. ("MEI")

operate six restaurants on the Oregon coast.  Defendant Moe's Southwest Grill, LLC ("MSWG")

franchises 300 restaurants in more than 30 states, including defendant Wraps of Argyle Square,

LLC ("Wraps") as a franchisee in the Pacific Northwest.  Plaintiffs contend that defendants' use

of the "MOE'S SOUTHWEST GRILL" mark infringes and dilutes plaintiffs' trademarks in

violation of federal and state laws.  Before the court is Defendants' Motion for Summary

Judgment (#68).  For the reasons below, I grant the motion and dismiss the claims.

## FACTS

I.  <u>The Restaurants and the Marks</u>

MSWG is the creator and franchiser of a chain of Southwestern restaurants that were

started in Atlanta, Georgia in 2000 and use the mark MOE'S SOUTHWEST GRILL.  There are

more than 300 Moe's Southwest Grill restaurants in over 30 states.  Wraps is MSWG's

franchisee that opened a Moe's Southwest Grill restaurant in Wilsonville, Oregon in April 2005.

Martin Sprock, the founder and Chief Executive Officer of MSGW, chose the "MOE'S"

portion of the mark because it was the name of one of his friends and was short in length.  He

chose the "SOUTHWEST GRILL" portion of the mark because he wanted the mark to

immediately communicate to consumers the type of food the restaurants serve.  Sprock had no

Page 2 - OPINION AND ORDER

actual knowledge of plaintiffs' mark, MO's, when he decided to adopt MSWG's mark. The United States Patent and Trademark Office ("USPTO") granted MSGW registrations for its MOE'S SOUTHWEST GRILL mark and logo. The application was denied at first on the ground that the mark was likely to cause confusion with plaintiffs' prior registration of their mark.

Plaintiffs collectively own six restaurants on the Oregon coast that operate under the marks MO'S RESTAURANTS and MO'S. Newport owns the marks and licenses them to MEI for use on its restaurants. The first Mo's restaurant was opened over 50 years ago by Mohava Niemi, whose nickname was Mo.

Plaintiffs' restaurants are family-style with a coastal theme in the interior design. The MO's logo uses a particular shade of medium blue that is carried over in the interior of the restaurant. Plaintiffs' restaurants are traditional casual restaurants in which customers are greeted by a hostess who seats them at a table where they are waited on by a waitress. Mo's is known for clam chowder and is not known for serving southwestern or Mexican food, although a few of those dishes appear on the menu from time to time at some of the restaurants. The menus vary at the different Mo's locations – for instance not all locations have a deep fryer due to lack of kitchen space. Mo's Annex regularly serves a chicken quesadilla and adds nachos, chips and salsa, and shrimp quesadillas to the menu on Thursday night. Original Mo's serves a fish taco. Some Mo's have a quesadilla on the kid's menu. Although the restaurants also serve various hamburgers, pasta dishes, and breakfast, the vast majority of the menu items center around fish and seafood.

Defendants' characterize their restaurants as fast casual restaurants. Customers walk up to a food preparation station, place their orders from a large menu board, seat themselves, get

their own drinks, and bus their own tables.  The restaurants display the MOE'S SOUTHWEST GRILL mark on exterior building signage.  The interiors of the restaurants are decorated in bright yellows, oranges, and reds.  The menu only offers food that is commonly characterized as Southwestern or Mexican, namely burritos, tacos, quesadillas, and fajitas.

Plaintiffs' logo has the word "Mo's" written in a traditional script, with the "M" capitalized, and all letters in a medium blue.  Defendants' logo has the word "MOE'S" all in block capital letters that are irregularly written.  The letters are in red with the apostrophe replaced by a yellow jalapeno pepper.  The words "southwest grill" are written in a more regular, lower case font that is usually in a smaller size and located below the word "Moe's."  On signage outside the restaurant, the words "southwest grill" are nearly the same size as the word "Moe's" and appear to the right of it.

II.    The Businesses

The six Mo's restaurants collectively serve 1.3 million customers annually.

Defendants have a web site at <www.moes.com>.  It has an edgy, tongue-in-cheek attitude.  The web site contains the full menu and sells Moe's merchandise such as T-shirts.

Plaintiffs have a web site named <moschowder.com> which sells chowder base and branded merchandise.  The home page has a water color painting of one of the restaurants.  Plaintiffs do not make any money off the web site and maintain it for the goodwill advertising.  Through June 8, 2005, there were 1972 total chowder sales with some in every state.

Mo's chowder base is sold in retail stores in Oregon, which has 40% of the sales, as well as Washington, Idaho, California, Nevada, Montana, Alaska, Colorado, Utah, and Arizona.

Most of plaintiffs' paid advertising takes place on the Oregon coast, in local newspapers, guides for the coast, and radio ads. Some of plaintiffs' customers who filled out comment cards live in other parts of the United States or other countries. Since the 1950s, Mo's has been featured in many northwest television and newspaper pieces, in at least two dozen magazine and newspaper articles that are distributed beyond Oregon, and on three nationally-broadcast television segments.

Only direct mail advertising is used to advertise the Moe's Southwest Grill in Wilsonville. MSGW provides radio ad copy which franchisees can use but there is no evidence that any have been aired in Oregon.

Many of defendants' print ads use the "MOE'S" portion of the mark much more prominently in phrases such as "Moe's knows burritos!" and "Moe's Burrito Box." The ads also display the full "MOE'S SOUTHWEST GRILL" mark somewhere on the ad, frequently in the upper left corner.

An October 2000 report titled Oregon Coast Travel Study Among Portland Area Residents states that when these people were asked what things come to mind when they think of Newport, 6% responded Mo's restaurant. Becker Decl. Ex. 7 at 12.

There is no evidence of lost sales to plaintiffs as the result of defendants' activities. There is no evidence in the record that anyone has ever made a purchase at one of defendants' restaurants under the belief that they were purchasing a meal from plaintiffs or from a restaurant approved or endorsed by plaintiffs.

Plaintiffs' management team considers word of mouth to be their most effective marketing tool. They are concerned that confusion between Mo's and Moe's Southwest Grill

Page 5 - OPINION AND ORDER

will cause damage to Mo's.  Some of plaintiffs' management team also resents what they consider to be defendants riding on Mo's coattails and well-established reputation.

Plaintiffs have adequate income to expand, along with the right management team.  They would like to expand in the Portland metropolitan area initially but have put any potential plans to expand on hold pending this litigation.  Prior to the litigation, plaintiffs did not have any one looking for a potential site and had no plans to hire an agent to do so.  The management team intended to keep their eyes open for possible sites when they visited Portland, which one of them did five or six days a week.

III.    Third Party Use of the MO'S Mark

Defendants provided a list of nearly 70 third parties across the country that use marks with the words "Mo," "Mo's," "Moe," or "Moe's" in whole or in part.  The list includes Moe's Deli in Portland, Odd Moe's Pizza in the Willamette Valley, and Mo's Seafood Factory in Maryland.  There are at least eight "MO's" or "MOE'S" marks currently registered on the principal register of the USPTO.

NPC entered into consent agreements with three third parties' restaurants in Washington, D.C., New Hampshire, and San Francisco.  The agreements state that the third parties' use of marks for restaurant services that include the terms "MO's" or "MOE's" are not likely to cause confusion with plaintiffs' marks.  The agreements also limited the third parties' expansion rights, recognized plaintiffs' superior rights to the mark, and required the third parties to pay for the right to use their marks.

Page 6 - OPINION AND ORDER

IV.    <u>Evidence of Confusion and Dilution</u>

There is testimony from one witness about evidence of actual confusion, and expert opinions on confusion of the marks and dilution of the MO's mark.

Jacqulyn Daniels testified that she was in line at a book signing when she overheard someone say that they were going to lunch at Mo's. Daniels thought the group was going to drive to the coast but they told her that there was a Mo's in Wilsonville. She drove to the location and found the Moe's Southwest Grill. Daniels thought it looked like a fast food Mexican restaurant so she knew it was not associated with Mo's.

Daniels described a second incident when she was on a senior bus trip going to Portland. Someone said that there is a Mo's in Wilsonville, that they love seafood and always drive to Lincoln City, and that they could have lunch in Wilsonville instead. Daniels explained that it looked like a Mexican restaurant to her so they should not go to the restaurant if they wanted to get seafood.

Both sides retained experts to conduct consumer surveys.

Defendants' survey was supervised by GMA Research Corporation. Three hundred consumers were stopped at two shopping malls in Portland and Eugene, asked a series of screening questions, and if they qualified, interviewed face to face in the research office. The consumers were shown exterior photographs of a Moe's Southwest Grill restaurant and a Panda Express restaurant and asked a series of questions about each photograph on who owns the restaurant, whether the consumer thinks it is associated with any other company or individual, and what type of food is served. 2% of the consumers replied that the Moe's Southwest Grill was either owned by Mo's on the Oregon coast or was affiliated with plaintiffs.

Plaintiffs' survey was designed by Dr. Itamar Simonson.  He supervised a telephone survey of 300 consumers in the State of Oregon and Vancouver, Washington designed to estimate the likelihood of confusion in the context of word-of-mouth advocacy.  Some consumers were asked about Moe's and a control group was asked the same questions about Mike's.  The consumers were asked to assume that a person said the following to them:

> We ate at [MOE's / MIKE'S], which is part of a chain.  I ordered tacos with beans, tofu, shredded cheese, salsa, and lettuce.  A friend came with me to [MOE'S / MIKE'S] and ordered a salad that included lettuce, beans, cucumbers, salsa, shredded cheese, black olives, and grilled chicken.  My question is whether or not you have heard or know about the [MOE'S / MIKE's] chain where that person ate?

Rocker Decl. Ex. 44 at 13.  If the consumer responded "Yes," he was asked follow-up questions.

Dr. Simonson concluded that the likelihood of confusion between Moe's Southwest Grill and Mo's is 14 %.  He also believes that the survey underestimated the likelihood of confusion in a word-of-mouth situation in which the conveyor of the information provided less details about the food.

Dr. Simonson also conducted a survey to estimate the actual dilution of the MO's mark resulting from the entry of Moe's Southwest Grill.  Surveyors telephoned 472 Oregon and Vancouver, Washington consumers and asked if they had heard of several restaurants:  Mo's, Sizzler, Arby's, Baja Fresh, McCormick & Schmick's, Olive Garden, and two control phantom names, Mary's and Gary's.  Additional questions were asked about Mo's and Olive Garden if the consumer indicated they knew about them.

Dr. Simonson concluded:  (1) 60.75 % of the consumers had heard about Mo's; (2) 30% of the consumers in Wilsonville have come to associate Mo's with the types of food sold by

Moe's, namely Mexican/Southwestern food; and (3) consumers in the control towns of

Beaverton, Clackamas, and Gresham were 16% more likely than consumers in Wilsonville to

identify Mo's with seafood.

Defendants retained Dr. Joel Steckel to critique Dr. Simonson's surveys. Dr. Steckel

raised several smaller points which I will not discuss because I believe they go more to the

weight to be accorded the survey, which is not a decision I can make in the summary judgment

context. Dr. Steckel also raised a few broader issues which I will discuss.

Concerning the confusion survey, Dr. Steckel opines that the context in which the survey

was administered does not fairly represent real world exposure to the MOE'S SOUTHWEST

GRILL mark. Dr. Steckel cites to plaintiffs' expert on word-of-mouth advocacy, Judy Melanson,

who estimates that 27% of the population are influenced by word-of-mouth advocacy. Dr.

Steckel concludes that Dr. Simonson's calculation must be adjusted to reflect that of the 14%

who were confused, only 27% would be influenced, for an adjusted level of 3.78% confusion.

I understand Dr. Steckel's point but I do not believe that the 3.78% figure measures the

likelihood of confusion considered in the *Sleekcraft* factors. The factor is whether one is likely to

be confused, not whether one is likely to be confused and take action based on the confusion.

Dr. Steckel makes a similar adjustment to reflect the fact that 21% of word-of-mouth

communication occurs over the telephone. I do not understand his explanation of why this

adjustment must be done so I will not address it. Accordingly, for purposes of this motion where

plaintiffs must be given the benefit of every inference, I will use Dr. Simonson's 14% figure for

the likelihood of confusion.

Page 9 - OPINION AND ORDER

Dr. Steckel concludes that there are reasons why Dr. Simonson's net estimate of fame/awareness for Mo's, 60.75 %, is inflated. The telephone context precludes the consumer from seeing the spelling of Mo's. Combined with the fact that there are many third-parties that use Mo's or Moe's as part of their business names, and that three of these are restaurants in the Portland metropolitan area, a consumer indicating that he had heard of "Mo's" could have been referring to any of these businesses because there were not adequate follow-up questions to identify the specific restaurant the consumer knew. Recalculating Dr. Simonson's raw data, Dr. Steckel reaches a net fame estimate of 49.35%, at most.

I agree with Dr. Steckel. I do not see how Dr. Simonson's questions lead to the conclusion that 60.75% of the consumers had heard of plaintiffs and were not referring instead to defendants or to one of the third parties that use the name in the area or other parts of the country. Although I realize that plaintiffs get the benefit of all inferences, I will keep this objection in mind when considering the fame factor in the dilution claim.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

Plaintiffs allege statutory claims for trademark infringement under 15 U.S.C. § 1114(1) and ORS Ch. 647, for unfair competition under 15 U.S.C. § 1125(a), for dilution under 15 U.S.C. § 1125(c) ("Dilution Act"), and for a violation of Oregon's Unlawful Trade Practices Act, ORS 646.605, as well as common law claims for trademark infringement and unfair competition.

> Trademark protection is the law's recognition of the psychological function of symbols. Two goals of trademark law are reflected in the federal scheme. On the one hand, the law seeks to protect consumers who have formed particular associations with a mark. On the other hand, trademark law seeks to protect the investment in a mark made by the owner.

Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 873 (9th Cir. 1999) (internal quotation and citation omitted).

I.    Trademark Dilution

Plaintiffs allege that defendants' use of their mark is a dilution of the distinctive quality of the MO'S mark in violation of 15 U.S.C. § 1125(c).

A trademark dilution claim does not require competition between the parties and a likelihood of confusion, both of which are elements of a trademark infringement claim. Avery, 189 F.3d at 873. "[T]he animating concern of the dilution protection is that the user of the diluting mark appropriates or free rides on the investment made by the trademark holder." Thane International Inc. v. Trek Bicycle Corp., 305 F.3d 894, 904 (9th Cir. 2002).

> Dilution is a cause of action invented and reserved for a select class of marks–those marks with such powerful consumer associations that even non-competing uses can impinge on their value. Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting "rights in gross" in a trademark. . . . If dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we

would upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses.

Avery, 189 F.3d at 875 (internal citation omitted).

The Federal Trademark Dilution Act, 15 U.S.C. § 1125, provides for an injunction if the plaintiff can establish that: "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark." Avery, 189 F.3d at 874.

Defendants contend they are entitled to summary judgment because plaintiffs cannot raise a factual issue that the MO'S mark is famous.

The act lists eight non-exclusive factors to guide the inquiry on famousness:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered . . . on the principal register.

Avery, 189 F.3d at 875; 15 U.S.C. § 1125(c)(1).

To meet the famousness element under the dilution statute, "a mark [must] be truly prominent and renowned."  Avery, 189 F.3d at 875 (internal quotation omitted).  "[A] mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark.  Put another way, . . . the mark must be a household name."  Thane, 305 F.3d at 911 (citing the legislative history examples of DUPONT, BUICK, and KODAK).

A.    Distinctiveness

Plaintiffs note that Mo is the nickname of Mohava Niemi, the founder of Mo's restaurants.  They argue that the length of use of the mark and extensive media coverage has come to uniquely and exclusively identify MO's with plaintiffs' restaurants.

Acquired distinctiveness is attained "when the purchasing public associated the [mark] with a single producer or source rather than just the product itself."  Avery, 189 F.3d at 876. Registration of the mark creates a presumption of distinctiveness, acquired distinctiveness in the case of a surname.  The dilution act's famousness requirement needs a showing greater than distinctiveness, however.  Id. at 876-77 ("because famousness requires a showing greater than mere distinctiveness, the presumptive secondary meaning associated with 'Avery' and 'Dennison' [as registered surnames] fails to persuade us that the famousness prong is met").

Plaintiffs here do not have a stronger case than the unsuccessful plaintiffs with the "Avery" and "Dennison" marks.  Avery had been in continuous use since the 1930s and Dennison had been in use since the late 1800s.  The marks were registered since 1963 and 1908, respectively.  The company spent more than $5 million per year on advertising.  Id. at 873, 877. Plaintiffs here have minimal advertising, and what exists is to a large extent limited to the Oregon coast.  No cost estimate for plaintiffs' advertising is in the record.  With the large number

Page 13 - OPINION AND ORDER

of third party uses of Mo's or Moe's, I conclude that no reasonable jury could find that this factor favors plaintiffs.

B.    <u>Duration and Extent of Use of the Mark</u>

Plaintiffs note that they have used the mark since at least 1960 and federally registered it in 1986.  There are now six restaurants on the Oregon coast, as well as the intent to expand into the Portland market.

The long use of the MO's mark in connection with plaintiffs' restaurants favors plaintiffs.

C.    <u>Advertising and Publicity of the Mark</u>

Defendants contend that plaintiffs' advertising within Oregon is mostly at the Oregon coast and advertising outside of Oregon is limited, sporadic, and only aimed at Washington and Idaho.

Plaintiffs note their advertisements on the Oregon coast and surrounding large metropolitan areas.  Comment cards have been filled out by customers from all over the United States.  Plaintiffs also note the importance of word-of-mouth advocacy to a restaurant. Additionally, Mo's restaurants have been featured in newspapers and magazines across the country and on three television segments broadcast nationwide.

Plaintiffs' advertising would have to be considered limited in extent and in geographic scope.  When deposed, members of the management team responded that the company had advertised in particular places outside the Oregon coast, but the deponents could not remember when.  It is true that Mo's restaurants have enjoyed more publicity outside their locale than most restaurants do.  It is not possible to determine from the record, however, how often this publicity

occurs.  Some of the newspaper articles appear rather dated.  The publicity does help balance the limited advertising.  this factor favors plaintiffs, but only slightly.

     D.     <u>Geographical Extent of the Trading Area and Degree of Recognition of the Mark</u>

Defendants argue that plaintiffs' six restaurants on the Oregon coast do not meet the requirement for a famous mark in a substantial trading area.  Defendants further contend that the limited Internet sales are so de minimis that they cannot establish fame.  Defendants contend that there is no evidence of the level of public recognition of the MO's mark outside of Oregon.  They argue that even plaintiffs' survey of Oregon residents shows a recognition level that is inadequate to constitute fame under the act.

Plaintiffs contend that courts have not established a statistical minimum and argue that the 60% name recognition in the survey indicates that MO's is a famous mark in Oregon.  Plaintiffs argue that national fame is not a required element of a dilution claim.  They point to marks for regional brands, such as Burgerville or Fred Meyer, which have great significance in one part of the country but none elsewhere.  Plaintiffs contend that Mo's is such a regionally famous brand under a niche fame theory and is entitled to an injunction within the identified limited market segment.  They also point to Mo's national recognition and publicity, extensive regional recognition, web site sales from around the country, and a public opinion study identifying Mo's as one of the main attractions on the Oregon coast.[1]

---

[1]  I disagree with this characterization of the study, which found that 6% of Portland residents thought of Mo's when asked what comes to mind when they think of Newport, but the point does not affect my analysis.

"The statute protects a mark only when a mark is famous within a niche market *and* the alleged diluter uses the mark within that niche." Thane, 305 F.3d at 908 (emphasis in the original).

> A reasonable factfinder could not, however, conclude that mobile bicycles and elliptical orbit machines operate in the same narrow market segment for purposes of the niche fame concept, although both products can be used for exercise. To maintain coherence, the niche fame concept must focus on highly specialized market segments with an identifiable customer base. Where those conditions obtain, participants are likely to make associations between marks that the general public will not make. As the market segments in which the senior and junior products operate become less specialized and less unitary, the notion that participants in those diverse markets will necessarily recognize and form mental associations with an established mark becomes increasingly questionable.

> In this case, the smallest market segment that bicycles and elliptical orbit machines could be said to share is the sporting goods market. This is a widely diverse market that encompasses everything from football helmets to ice skates. There is no reason why participants in this broad market will have any particular knowledge about products in submarkets in which they do not participate.

Thane, 305 F.3d at 909.

Worldwide use, through an internet web site, of a non-famous mark does not establish fame. Avery, 189 F.3d at 879. There is no evidence that plaintiffs' web site has a significant presence. I will not address it further.

The idea of a niche market, which is nationwide, differs from the idea of a regional market. Thane is very instructive on how to apply the niche market concept to this case. The niche concept focuses on "highly specialized market segments with an identifiable customer base." Thane, 305 F.3d at 909. Thane concluded that the smallest market bicycles and elliptical orbit exercise machines shared was the sporting goods market, which was too wide to be considered a niche. Here, Mo's and Moe's are strikingly different restaurants, each specializing

in different types of food and one offering waitress service while the other requires ordering at a

counter and carrying the food to a table after it is prepared in front of the customer.  The smallest

market they could be found to share is casual restaurants.  The broad array of food types, ranging

from Mexican to Chinese to hamburgers to pizza to delis convinces me that the casual restaurant

market is too broad to be considered a niche, similar to the sporting goods market in Thane.  If

you narrow the casual restaurant market further and define it by food type, Mo's and Moe's

operate in different markets, namely Southwestern/Mexican and seafood.  The difference in

service levels would also separate the restaurants into different niches if the casual restaurant

market was further divided on that basis.  Consequently, plaintiffs cannot proceed on a niche

market concept.

     I now turn to the concept of a regional market.

> The drafters of the Federal Trademark Dilution Act broke from the Trademark
> Review Commission's recommendation that only marks "which have become
> famous throughout a substantial part of the United States" could qualify for
> protection.  Report & Recommendation, 77 Trademark Rep. at 456.  Instead, fame
> in a localized trading area may meet the threshold element under the Act if
> plaintiff's trading area includes the trading area of the defendant.  S. Rep. No.
> 100-515, at 43 . . . .

Avery, 189 F.3d at 877-78.

     The court noted that no evidence supported plaintiff's position on this issue and then

discussed niche markets.  Id. at 878.  I agree with defendants that the quoted comment is dicta.

> While there is nothing in the statute itself that explicitly defines the
> required territorial scope of "fame," in the author's view, ordinarily a mark should
> not be dubbed "famous" under the Federal Act unless it has been used on a
> substantially national scale.  Otherwise, a company which is seeking to clear a
> new mark for national use will not know if the same mark previously used on
> unrelated goods may be "famous" only in one city or in one small region of the
> country.  To grant federal protection to a mark "famous" only in a local area

would not serve the Act's goal of promoting "uniformity and consistency" in the law of trademarks. In the author's view, a mark used only in one state or in a small region of the U.S. should not be categorized as "famous" under the federal law.

The courts could develop a presumption that if a mark is used on a national scale, factor (D) is satisfied, while if a mark is not used on a national scale, factor (D) is presumed not to be satisfied. Another helpful rule of thumb could be that if a mark is not being used or advertised or is not well-known in geographical areas in which 75% of the U.S. population lives, this factor is not satisfied. It is incumbent on the courts to develop some such benchmarks of predictability.

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:92 (4th ed. 1996) (footnotes omitted) [hereinafter McCarthy].

Other courts have contemplated the meaning Congress intended for fame under the Dilution Act. "It seems most unlikely that Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce." TCPIP Holding Co. v. Haar Communications, 244 F.3d 88, 99 (2nd Cir. 2001) ( 228 retail children's clothing stores in 27 states with yearly sales of $280 million and "tens of millions of dollars" spent in advertising the mark over a decade was insufficient evidence of fame of the store's mark to support a preliminary injunction premised on the Dilution Act).

Based on my conclusion that the discussion in Avery is dicta, the fact that Avery does not define a localized trading area, and the analysis in TCPIP and McCarthy, I conclude that the Dilution Act requires fame in a substantial part of the United States.

Ignoring the problem discussed above with the Simonson survey, it shows at best that 60.75% of Oregonians are aware of Mo's. There is no survey data from other states. There is

evidence in the form of comment cards, a small number of Internet sales, and publicity outside of Oregon that people from other states are aware of Mo's. There is no way to quantify the data, but it does not appear to reach the level of a household name outside of Oregon.

This factor strongly favors defendants.

E.      Channel of Trade

Defendants concede for purposes of this motion that the parties' channels of trade are similar to the extent both operate restaurants. Thus, this factor favors plaintiffs.

F.      Use of the Same or Similar Marks by Third Parties

Defendants argue that the eight federal registrations and nearly seventy common law users of marks that include the terms "Mo," "Mo's," "Moe," or "Moe's" weighs heavily against a finding of fame for the MO'S mark.

Plaintiffs contend that many of these third-party users are the subject of plaintiff's enforcement efforts, are no longer operating, or are in parts of the country other than the northwest.

"[W]hen a mark is in widespread use, it may not be famous for the goods and services of one business." Avery, 189 F.3d at 878 (interpreted as a factor and not a total prohibition).

There is evidence that plaintiffs do undertake some policing of their mark but, due to limited resources, they have been unable to stop the third party use, even within the restaurant business. This factor favors defendants.

G.      Registration of the Mark

Plaintiffs own a federal registration of the MO's mark for restaurant services. Thus, this factor favors plaintiffs.

Page 19 - OPINION AND ORDER

H.    Identity of the Marks

The Ninth Circuit established the additional requirement that in a dilution claim, "the mark used by the alleged diluter must be identical, or nearly identical, to the protected mark." Thane, 305 F.3d at 905 (factual issue exists on whether TREK and OrbiTrek are nearly identical). Although the parties do not address this issue, it is not needed to complete my analysis.

I.    Summary

The evidence of the geographic trading area and degree of recognition of the MO's mark is inadequate to establish fame as I construed it above.  Even if I were to conclude that plaintiffs raised a factual issue about the fame of MO's in Oregon, there is no factual issue raised that MO's is famous in a substantial part of the United States.  The publicity outside of Oregon does not show that the mark is remembered.  There is no survey data for consumers outside of Oregon. The large amount of third party use also weighs heavily against plaintiffs.  I find that a reasonable jury could not find that MO's is famous as defined by the Dilution Act.  I grant summary judgment dismissing the claim.

II.    Likelihood of Confusion

Plaintiffs' federal and state statutory claims for trademark infringement and unfair competition, as well as their related common law claims, all require proof that there is a likelihood of confusion.

"The test for likelihood of confusion is whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks."  Dreamwerks Production Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998) (internal quotation omitted).  The Ninth Circuit relies on the *Sleekcraft* factors when

analyzing the likelihood of confusion.  They are:  "(1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion."  Id.; AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979). The factors are not rigidly weighed but are intended to guide the court.  Dreamwerks, 142 F.3d at 1129.  Likelihood of confusion requires that confusion is "probable, not simply a possibility." Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002).

A.    Strength of Mark

Defendants contend that the MO's mark is weak due to the amount of third-party use of similar marks.  Plaintiffs contend the mark is strong because it is recognized by millions of consumers.

Stronger marks are given greater protection by the trademark laws than weaker marks. "This is so because a strong mark is inherently distinctive, and therefore it is more likely that consumers will be confused by another's use of the same or similar mark."  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002) (internal quotation and citation omitted).  A descriptive mark is entitled to trademark protection only if it has acquired secondary meaning.  A mark's incontestable status serves as conclusive proof that the mark has secondary meaning but does not require a finding that the mark is strong.  Id. at 1142 n.3.  Although personal names used as marks are not inherently distinctive, they are treated as strong marks on a showing of secondary meaning.  Secondary meaning is the consumer's association of the mark with a particular source.  E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992). "Use of similar marks by third-party companies in the relevant industry weakens the mark at

issue." <u>M2 Software, Inc. v. Madacy Entertainment</u>, 421 F.3d 1073, 1088 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1772 (2006).

As discussed above, there are problems with the Simonson survey's conclusion that 60% of Oregonian consumers recognize Mo's mark.  The evidence of significant third-party use of the mark, even within the restaurant industry, weakens the mark.  These factors are balanced by the 1.3 million annual customers at Mo's and the publicity around the country.  Overall, this factor slightly favors defendants due to the third-party use of the mark.

      B.    <u>Relatedness of Goods</u>

Defendants contend the two restaurants are as different as can be, including the service formats, menus, restaurant design, color schemes, and signage.  Plaintiffs disagree, arguing that the two restaurants provide related services because both serve food.  Plaintiffs contend that the two sell the same product to the same consumers, at the same price point, in a family friendly environment.  Plaintiffs note the overlap in menu items.  Plaintiffs also argue that the "look and feel" of the restaurants is a trade dress issue which is irrelevant to these trademark claims.

I disagree with plaintiffs' statement that trade dress is irrelevant.  Marks should be considered in their entirety and as they appear in the marketplace.  <u>Entrepreneur Media</u>, 279 F.3d at 1144.   Thus, other than in word-of-mouth or radio advertising, a consumer would encounter defendants' mark either at a restaurant, on the web site, or in a print ad, all of which will include part of the "look and feel" of the restaurant.

The more closely related the goods are, the more likely consumers will be confused by similar marks.  "Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." <u>Entrepreneur Media</u>,

Page 22 - OPINION AND ORDER

279 F.3d at 1147-48.  The weight that relatedness carries in the analysis depends on the strength

of the mark.  Id.  Complementary goods are considered related goods.  Gallo, 967 F.2d at 1291

(finding that wine, cheese, and salami were complementary goods because they are frequently

served and promoted together).

Here we have two very different restaurants whose only similarity is the pronunciation of

the name if Moe's is referred to with a shortened form of its mark.  I do agree with plaintiffs that

we must assume that the shortening will occur.  A consumer would not visit the restaurants

together.  The look of the restaurants, and the type of food served, is totally different.  This factor

favors defendants.

      C.     Similarity of Sight, Sound, and Meaning

Defendants note the inclusion of the phrase "Southwest Grill" in their mark and the use of

the full mark on the outside of the restaurants, the addition of the letter "e" in Moe's, and the

differences in style of the marks, including the yellow jalapeno pepper in defendants'.  Plaintiffs

contend that the marks are essentially identical since they are pronounced alike and differ in

spelling only by the "e."  Plaintiffs note that defendants entire mark is commonly shortened to

"Moe's," both by defendants in their use of the mark and by people when discussing the

restaurant.  Defendants reply that even when the mark is shortened in advertising and marketing

materials, it nearly always appears alongside the full MOE'S SOUTHWEST GRILL.

In the similarity analysis:  "(1) Marks should be considered in their entirety and as they

appear in the marketplace; (2) Similarity is best adjudged by appearance, sound, and meaning;

and (3) Similarities weigh more heavily than differences."  Entrepreneur Media, 279 F.3d at

1144.  "[R]estaurants are often recommended by word of mouth and referred to orally, [so] it is

the word portion of applicant's mark which is more likely to be impressed on the consumer's memory." In re Dixie Restaurants, Inc., 105 F.3d 1405, 1407 (Fed. Cir. 1997).

MO'S and MOE'S cannot be distinguished when spoken.  The full marks differ when spoken because of the addition of "SOUTHWEST GRILL."  At times, however, including in Moe's own advertising, MOE'S is used alone in phrases such as "Moe's Knows Burritos."

When MO's and MOE's are compared in print that is not the font used in the actual logo, the addition of the "E" does not necessarily make the marks dissimilar.  See Dreamwerks, 142 F.3d at 1131 (when comparing Dreamwerks and DreamWorks, "[s]pelling is a lost art").  The marks used in the logos, however, are not similar at all due to the vastly different fonts and, of course, the jalapeno pepper.

Overall, this factor slightly favors plaintiffs.  The shortened form of the marks are identical when spoken and very similar when used in print without the logo font.

D.    Actual Confusion

Defendants contend that there is no evidence of actual confusion and argue that Jackie Daniels was not confused.  Defendants also note that plaintiffs have not lost any sales and know of no one who ate at Moe's Southwest Grill, thinking it was a restaurant associated with plaintiffs.  Defendants contend this is evidence of a lack of confusion in light of the fact that their Wilsonville restaurant has been open for over a year.  Defendants also point to the survey results from both sides' experts.

Plaintiffs argue that their expert's survey demonstrates actual confusion in the marketplace.  They also contend that Jackie Daniels' initial confusion is sufficient to prove actual confusion due to the identical pronunciation of the names.

"Evidence of actual confusion is strong evidence that future confusion is likely.  A reasonable juror may, however, find *de minimis* evidence of actual confusion unpersuasive as to the ultimate issue of likelihood of confusion."  Entrepreneur Media, 279 F.3d at 1150 (internal quotation omitted).  "But if a party produces evidence from which a reasonable jury could surmise that an "*appreciable* number" of people are confused about the source of the product, then it is entitled to a trial on the likelihood of confusion–although it will not necessarily prevail at that trial."  Thane, 305 F.3d at 902 (emphasis in the original) (survey result of 27.7% confusion was evidence from which a reasonable jury could conclude that actual confusion existed).  Confusion survey results below 10% are evidence that confusion is not likely. 5 McCarthy § 32:189.

The evidence of actual confusion is limited to Jackie Daniels' initial interest confusion and confusion of the other bus riders, whom Daniels corrected.  Although this is not an appreciable number, this evidence is bolstered by the Simonson survey result that the likelihood of confusion is 14%.  Even though the percentage is barely over McCarthy's threshold, and is the subject of attack by defendants' expert, this factor favors plaintiffs.

 E. Marketing Channels

Because plaintiffs' web site has only modest sales and no evidence of the amount of traffic to it, defendants contend that the web site cannot be considered a prominent part of plaintiffs' advertising.  Defendants also note the very different commercial impression between the two companies' web sites.  Other than the web sites, defendants contend that the marketing channels do not overlap at all.

Plaintiffs contend that the parties' services are marketed through the same channels because they both rely on word of mouth, radio advertising, and publicity generated by being involved in charitable causes and in the community.

> *Some* use of the Internet for marketing, however, does not alone and as a matter of law constitute overlapping marketing channels.
>
> _____The proper inquiries are whether both parties use the Web as a *substantial* marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way.

Entrepreneur Media, 279 F.3d at 1151 (internal quotation and citation omitted, emphasis in the original).

There is no evidence that either party uses the Internet as a substantial marketing and advertising channel, so there is no overlap there.  The expert reports state that restaurants, and thus both plaintiffs and defendants, rely on word-of-mouth as a marketing channel.  Both parties also support charities that work in the area of missing children.  There is no overlap in newspaper or radio ads (plaintiffs only) or direct mail ads (defendants only).  Consequently, this factor only slightly favors plaintiffs due to the reliance on word-of-mouth advocacy.

F.    Purchaser Care

Defendants note their expert's report that restaurant patrons use care in choosing a restaurant.  In LeSourd's opinion, a consumer's choice of restaurant depends on many factors, including the activity (family celebrations, leisure and vacations, and business), time constraints, convenience of location, budget, food preference, and the make up of the party (for example, whether the group includes children or senior citizens).

Page 26 - OPINION AND ORDER

Plaintiffs disagree, citing Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 638 (6th Cir.), cert. denied, 459 U.S. 916 (1982), for its statement that the degree of care in fast-food restaurant selection is subject to impulse buying and is not likely to be the object of intensive consumer research.

It is assumed that buyers exercise greater care when buying expensive goods. Gallo, 967 F.2d at 1293 (although a finding that consumers rely more on brand names and exercise less care when buying wine and cheese may not prove much, it is not made in clear error).

Plaintiffs cite no evidence to support the contention in Frisch's that the selection of fast-food restaurants is subject to impulse buying. Moreover, the restaurants at issue here are a cut above the typical fast food restaurant, based on the atmosphere and the average ticket price. Defendants' expert states what seems to be common sense, that even though the purchase of a meal is not a big-ticket item, consumers use care in deciding where they want to eat. This factor favors defendants.

G.    Intent

Defendants contend they adopted their mark in good faith and that there is no evidence of intent to deceive. Plaintiffs argue that defendants had constructive notice of the MO'S mark due to its federal registration, knew about Mo's when they franchised a restaurant in Oregon, and knew of Mo's when they decided to offer fish as a meat option.

"Intent to deceive is strong evidence of a likelihood of confusion" because the alleged infringer's judgment as to what is likely to be confusing might be accurate. Entrepreneur Media, 279 F.3d at 1148 (internal quotation omitted). Although knowledge of the senior mark can be actual or constructive, this factor has little importance because intent to confuse is not required

Page 27 - OPINION AND ORDER

for a finding of trademark infringement.  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199,

1208 (9th Cir. 2000).

There is no evidence of defendants having actual notice of the MO'S mark.  Thus, there is

no evidence that defendants intended to have a confusing mark, regardless of the constructive

notice.  This factor favors defendants.

H.    Likelihood of Expansion

Defendants admit that they intend to expand the use of their mark in Oregon although

there are no present expansion plans here.  They argue that plaintiffs have no concrete expansion

plans of any kind.  Plaintiffs maintain that now that the company has returned to profitability and

has new management in place, it is in a position to expand in the Portland metro area but has put

expansion plans on hold pending the conclusion of this case.

A strong possibility of expansion into competing markets weighs in favor of a finding of

infringement.  Gallo, 967 F.3d at 1293.  The court determines whether the existence of the

allegedly infringing mark is hindering plaintiff's expansion plans.  Interest in expanding has been

characterized as "mere speculation" and not evidence of expansion plans.  Surfvivor Media, Inc.

v. Survivor Productions, 406 F.3d 625, 634 (9th Cir. 2005).

The mileage between plaintiffs' and defendants' restaurants is large enough that they

currently do not compete for customers.  The issue, then, is whether plaintiffs have a strong

possibility of expanding into the Portland metropolitan area or defendants have plans of

expanding to the Oregon coast.  The plans of both sides are currently in the future wishes stage,

with no concrete plans in place.  Consequently, this factor favors defendants.

I.    Summary

Factors that favor a finding of a likelihood of confusion include the similarity of the marks in certain limited contexts, the Simonson survey showing a confusion rate of 14%, and the slightly overlapping marketing channels.  Factors favoring defendants' position are the weakness of the MO'S mark due to third-party use, the unrelatedness of the goods, the purchaser care in selecting a restaurant, lack of defendants' intent to deceive, and plaintiffs' lack of expansion plans.

Defendants asked me to review Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625 (9th cir. 2005), in which the court affirmed summary judgment granted to the producers of the reality TV show against the claim of Surfvivor, a company that sold Hawaiian beach-themed products.  Sleekcraft factors that favored a likelihood of confusion were:  (1) Surfvivor had a suggestive mark entitled to protection; (2) defendants also had a strong mark; (3) there was a minor overlap of marketing channels; (4) consumers would likely exercise very little care when purchasing the least expensive products in the line, like sun screen, but the factor was neutral concerning the more expensive products; and (5) defendant knew of the Surfvivor mark.  Surfvivor had evidence of actual confusion by one retailer and one customer but defendant's survey showed an absence of significant confusion.  The sight and meaning of the mark subfactors favored defendant but the sound subfactor favored Surfvivor.  The court held that Surfvivor did not raise a factual issue regarding the likelihood of confusion.  Id. at 632-34.

This is a close case.  The factors that favor plaintiffs do not do so overwhelmingly.  The marks are only similar when spoken or written without the logo font and with defendants' mark in shortened form.  When the marks are used in the context of a print ad or at the restaurants

Page 29 - OPINION AND ORDER

themselves, there are no similarities.  The overlap of marketing channels is only in

word-of-mouth.  There is no overlap in the use of newspaper ads, radio ads, or direct mail ads.

The evidence of actual confusion, through the testimony of Jackie Daniels, is de minimis and no

greater than in <u>Surfvivor</u>.  The Simonson survey, even when ignoring defendants' attacks on its

methodology, shows a likelihood of confusion factor of only 14%.  This is barely above

McCarthy's threshold that confusion survey results below 10% are evidence that confusion is *not*

likely.

     Likelihood of confusion requires that confusion is "probable, not simply a possibility."

<u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 842 (9th Cir. 2002).  Plaintiffs' evidence gets to the level

of a possibility but they have not demonstrated a genuine issue of material fact that the likelihood

of confusion is probable.  Accordingly, I grant summary judgment and dismiss all of the federal

and state statutory claims for trademark infringement and unfair competition, as well as the

related common law claims.

## CONCLUSION

     Defendants' Motion for Summary Judgment (#68) is granted.  This action is dismissed

with prejudice.

     IT IS SO ORDERED.

     Dated this    28th    day of September, 2006.


          /s/ Garr M. King          
          Garr M. King
          United States District Judge


Page 30 - OPINION AND ORDER